| | |
|---|---|
| STATE OF MAINE<br>YORK, ss | SUPERIOR COURT<br>CIVIL ACTION<br>DOCKET NO. CV-20 |

| | |
|---|---|
| STEVEN GAUDETTE | )<br>) **PLAINTIFF'S COMPLAINT FOR**<br>) **RETALIATION AND DISCRIMINATION** |
| **Plaintiff,** | )<br>)<br>)<br>) |
| v. | )<br>)<br>)<br>) |
| **SHAW'S SUPERMARKETS INC.** | )<br>) |
| **Defendant.** | ) |

NOW COMES Plaintiff, Steven Gaudette, ("Gaudette" or "Plaintiff") by and through his attorney of record, the Law Office of Guy D. Loranger, and complains against Defendant as follows:

## PARTIES AND JURISDICTION

1. Gaudette always mentioned herein resided in the town of Biddeford, State of Maine.

2. Defendant Shaws ("Defendant") operates grocery stores.

3. All incidents herein on which Gaudette sues occurred in the County of York, State of Maine.

4. Plaintiff requests a jury trial.

## ALLEGATIONS

5. Gaudette has been employed Defendant for over 25 years at Defendant's Wells Distribution Center.

6. On 7/25/16, Defendant's suspended Gaudette for a work-related accident.

1

7. On 8/12/16, Gaudette and his union believed the suspension to be illegal, including a violation of the Collective Bargaining Agreement ("CBA"), so he engaged in protected activity under the Maine Whistleblowers Protection Act ("WPA") by opposing the illegal action by threatening to file a grievance.

8. On 8/12/16, Gaudette and Defendant entered into a Memorandum of Agreement ("Agreement") to resolve the illegal action. In the Agreement, Gaudette agreed to not file a grievance, and Defendant agreed to have Gaudette return to work on 8/15/16. The Agreement also stated that Gaudette would be terminated if he had a safety violation within a year.

9. On 8/23/17, more than a year after the Agreement, Gaudette was involved in a safety incident.

10. As a result of the subject incident, Defendant claimed that Gaudette had violated the Agreement, and it gave him notice of his termination effective 8/30/17.

11. The termination was an illegal violation of the Agreement, in part, because the relevant incident took place more than a year after the Agreement was signed. Accordingly, Gaudette and his union again engaged in protected activity under the WPA by opposing the illegal action through the filing of a grievance under the CBA protesting the illegal termination.

12. On 3/7/18, Gaudette, his union and Defendant resolved the illegal termination by entering into a Memorandum of Agreement ("Agreement II"). In Agreement II, Gaudette agreed to withdraw his grievance in exchange for Defendant returning him to the work effective 3/19/18.

13. After Gaudette returned to the work force, Defendant commence to subject Gaudette to continual adverse employment actions in retaliation for his engaging in protected activity in order to be reinstated. The retaliatory adverse employment actions include, but are not limited to, those listed in the subsequent paragraphs.

14. Defendant began to issue arbitrary, differential and baseless discipline against Gaudette. The subject discipline includes, but is not limited to, the following:

    - On 4/16/18, Defendant issued Gaudette an unjustified verbal warning for "Unsatisfactory Job Performance".
    - On 4/16/18, Defendant issued Gaudette an unjustified verbal warning for an alleged safety violation.
    - On 4/16/18, Defendant issued an unjustified one-day suspension to Gaudette for alleged time abuse.

15. On or about 4/16/18, a supervisor told one of Gaudette's co-workers that Gaudette had made an offensive statement about the co-worker. The allegation was false, but the co-worker became upset.

16. On or about 4/17/18, two of Gaudette's supervisors falsely accused him of harassing co-workers.

17. Defendant's management has treated Gaudette differently than his co-workers. For example, on 5/17/18, supervisor Christine Scott ("Scott") allowed all staff, except for Gaudette to leave for the night. Scott forced Gaudette to stay an extra 40 minutes. All staff are to be released at the same time. Gaudette reported the incident to management. The next day Scott was seen laughing with Gaudette's co-workers about the subject incident.

18. Supervisors scrutinized Gaudette's work area, looking for work related issues.

19. On Mondays, Gaudette's supervisors would inspect his work area, looking for damage for him to fix. One of the supervisors admitted to Gaudette that his co-workers were not subjected to the same scrutiny.

20. Scott has complained that Gaudette should not be working for Defendant.

21. Defendant monitors Gaudette on security cameras.

22. Defendant requires Gaudette to seek permission to leave his work area. Defendant does not require Gaudette's co-workers to seek such permission.

23. On 5/18/18, Defendant falsely accused Gaudette of not turning in his paperwork. Gaudette told his supervisor to view the security tapes to see who took his paperwork. On 5/21/18, a supervisor told Gaudette that the paperwork had somehow appeared on his clipboard.

24. On 5/28/18, a co-worker, Lenny Foster ("Foster") falsely accused Gaudette of almost hitting him with his truck.

25. On 5/29/18, a supervisor accused Gaudette of trying to hit Foster with his truck. Gaudette denied the allegation and told the supervisor to simply view videotape from the security cameras.

26. On 5/31/18, the supervisor told Gaudette that he was lucky that he told the truth about not trying to hit Foster with his truck.

27. On 6/5/18, Foster falsely accused Gaudette of harassment. To the contrary, Foster had been harassing Gaudette since his return to work.

28. Defendant investigated Foster's complaint. Gaudette strenuously denied harassing Foster. Defendant, however, concluded that both Foster and Complainant were at fault.

29. In July, Foster sprayed Gaudette with windshield wiper fluid.

30. Foster would leave bags of plastic in Gaudette's work-zone. Gaudette reported the incident to management.

31. On 8/7/18, Gaudette swept up his area at the end of his shift. Foster then went and kicked around what Gaudette had swept up. Gaudette reported the incident to Scott.

32. The employees generally park their vehicles in the same spot. In August, Foster began to park where Gaudette usually parked.

33. Gaudette again reported Foster's harassment to management. Gaudette is not aware of management taking any remedial action in response to the notice. Foster, therefore, continued to harass Gaudette.

34. On 8/15/18, Gaudette engaged in protected activity by requesting a meeting with management to address the ongoing hostile work environment and retaliation. Gaudette presented management with a seven-page document listing some examples of the harassment and retaliation.

35. The next day, management retaliated against Gaudette by falsely accusing him of causing issues in the workplace.

36. On 8/17/18, Gaudette's supervisors further retaliated against him by falsely accusing him of bothering a co-worker and warned him to stay away from the co-worker.

37. On 8/20/18, Gaudette again engaged in protected activity under the WPA and the MHRA by submitting a request from his health care provider to remove him from

workplace and placed him on medical leave. The medical provider wrote the "condition is causing elevated blood pressure which could result in heart disease stoke over time." The health care provider also diagnosed "marked anxiety, irritability, insomnia, situational depression, difficulty w/ interpersonal relationship – unable to function in the workplace."

38. Gaudette then called Scotty Strout ("Strout") of human resources to give notice of his medical leave.

39. On 8/22/18, Gaudette called Strout to discuss his hostile work environment and his medical leave. Strout, however, did not call Gaudette back, so he again called Strout on 8/27, 8/30 and 9/6.

40. On 8/27/18, Gaudette filed a request for FMLA due to the hostile work environment and its impact upon his health and well-being.

41. On 8/27/18, Gaudette's wife called Strout to report some of the harassment and retaliation experienced by her husband. Strout asked for Complainant's phone number.

42. On 9/27/18, Gaudette's current legal counsel wrote Strout to notify of his representation of Gaudette and further wrote:

> We understand you are aware of Mr. Gaudette and the hostile work environment which he has endured and caused him to go on leave. Mr. Gaudette has provided notice of the hostile work environment to you and other members of management. Mr. Gaudette even provided a detailed written statement describing several instances of harassment. The harassment, however, has continued despite such repeated notice. Due to the hostile environment, Mr. Gaudette's treating physician recently had to remove him from the workplace. To date, Mr. Gaudette remains on leave. Given the situation, we expect Shaw's to immediately undertake a thorough and objective investigation reasonably designed to remedy the hostile work environment.

6

43. On 10/4/18, Defendant's human resources corporate representative from Phoenix, Arizona called to ask for his date to return to work. Gaudette advised that his physician make the decision.

44. On 10/22/18, Gaudette returned to work. Upon his return, he presented management with a request for a medical accommodation from his physician. The accommodation requested that Gaudette0be allowed to leave work if the issues which put him out of work arose again. A representative from human resources acknowledge receipt of the request for accommodation but warned Gaudette that he would be terminated if he left.

45. On 10/22/18, manager Eric Laughlin called Gaudette to his office to meet with him and two others go over Complainant's written allegations.

46. On 10/23/18, supervisor Jackson welcomed Gaudette back to work. Within a couple of minutes, someone radioed Jackson to "stop talking to Gaudette and get to work"

47. On 10/25/18, Foster took Gaudette's parking spot. Foster then moved his vehicle a few hours later to beside where Gaudette had parked. Pete Richards printed pictures of the incident from the security cameras.

48. On 10/29/18, Foster yelled at Gaudette from a distance for no known reason.

49. On 10/30/18, Foster pulled a pin out of a box on the wall, so Gaudette could not open a door to do his job. This is also a door used by police and rescue in an emergency. Gaudette did not know about the pin, so he went to maintenance for assistance. Maintenance told Gaudette of the pin being removed. Security then viewed the security video and saw that Foster had removed the pin. Defendant suspended Foster for the incident.

50. Co-workers told Gaudette that Foster had done five years in prison for charges related to either guns or drugs.

51. After his suspension, Foster took to Facebook to blame Gaudette for his suspension and to issue threats to Gaudette. Gaudette reported the threats to the police.

52. Some co-workers subsequently began to call Gaudette a "rat" and other derogatory names. Gaudette again reported the harassment to management.

53. On or about 11/14/18, Gaudette called Strout to ask about the status of his request for a medical accommodation. In response, Strout simply told Gaudette that he did not have enough time to qualify for FMLA.

54. The next day, Gaudette's wife sent Strout an email recounting the previous days conversation between Strout and Gaudette and asked if it was accurate.

55. On or about 11/15/18, Gaudette reported to management of a co-worker placing cardboard and wood in bins in his work zone designated only for plastic. In response, a supervisor Ian asked Gaudette if he felt like he was being harassed. Gaudette replied yes.

56. On or about 11/27/18, human resources met with Gaudette to request details of the harassment and subsequently given him a number to call for FMLA.

57. On or about 12/7/18, as Gaudette left work, a co-worker called him offensive names.

58. On or about 12/12/18, Gaudette reported to Scott about certain employees again placing cardboard and wood in bins in his work zone designated only for plastic.

59. On or about 12/13/18, a co-worker Scott McKinney ("McKinney"), began to yell at Gaudette, yelling "what is your F'ing problem" and accusing Gaudette of harassing employees. McKinney then got in Complainant's face, yelling " you are a piece of

shit" and giving him the finger before adding " you're a piece of shit and nobody wants you here, why don't you do us all a favor and quit". In response, Gaudette simply looked up at the security camera to which McKinney stuck both of his middle fingers to the camera. McKinney then warned Gaudette that "we are having a meeting tomorrow and you better bring your lawyer because you are going to need one". Gaudette reported the incident to management.

60. On 12/13/18, Complainant's physician again took him out of work after diagnosing him with PTSD and Acute Stress Reaction.

61. In January of 2019, Gaudette engaged in protected activity under both the WPA and the Maine Human Right Act by filing a complaint for discrimination and retaliation.

62. On 2/18/19, Gaudette returned to work from medical leave.

63. After Gaudette returned to work the harassment and retaliation resumed. For example, management treated him differently than his co-worker, scrutinizing his work unlike his co-workers, treating him with disdain, falsely accusing him of job performance issues and issuing numerous baseless writeups. The harassment and retaliation have continued as of the filing of this lawsuit.

64. Gaudette has complied with the administrative requirements by filing a complaint with the Maine Human Rights Commission and receiving a right to sue letter.

65. Plaintiff has suffered the damages set forth below.

### COUNT I: RETALIATION IN VIOLATION OF THE MAINE WHISTLEBLOWERS PROTECTION ACT

66. Foss incorporated by reference the above allegations.

9

67. The WPA, which is administered through the Maine Human Rights Act ("MHRA"), makes it illegal for an employer to retaliate against an employee engaging in protected activity under the WPA.

68. Gaudette engaged in protected activity as alleged *supra.*

69. After Gaudette engaged in protected activity, Defendant retaliated against Gaudette by subjecting him to the adverse employment actions alleged *supra.*

70. Defendant's action amounted to retaliation in violation of the WPA.

## COUNT II: RETALIATION IN VIOLATION OF THE MAINE HUMAN RIGHTS ACT

71. Foss incorporated by reference the above allegations.

72. The Maine Human Rights Act ("MHRA"), makes it illegal for an employer to retaliate against an employee engaging in protected activity under the MHRA.

73. Gaudette engaged in protected activity as alleged *supra,* after Gaudette engaged in protected activity, Defendant retaliated against Gaudette by subjecting him to the adverse employment actions alleged *supra.*

74. Defendant's action amounted to retaliation in violation of the MHRA.

## COUNT III: DISABILITY DISCRIMINATION

75. Plaintiff incorporates by reference the allegations in the above paragraphs.

76. The MHRA makes it illegal for an employer to discriminate against an employee with a medical disability.

77. Plaintiff has a disability as defined by the MHRA.

78. Defendant had notice of Plaintiff's disability.

79. Defendant has discriminated against Plaintiff by subjecting him to the adverse employment actions alleged *supra*.

80. Defendant actions also amounted to reckless disregard for the MHRA.

81. Plaintiff has suffered the damages set forth below.

## COUNT IV: FAILURE TO ACCOMMODATE

82. Plaintiff incorporates by reference the allegations in the above paragraphs.

83. The MHRA makes it illegal for an employer to fail to reasonably accommodate an employee in a timely manner.

84. Defendant refused to reasonably accommodate Plaintiff due to his disability.

85. Defendant's failure to reasonably accommodate Plaintiff violated the MHRA.

86. Defendant actions also amounted to reckless disregard for the MHRA.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court (1) enter judgment of favor of the Plaintiff and (2) award damages sufficiently large to compensate for damages he has suffered as a result of Defendants conduct including, but not limited to, damages for general and non-economic damages, economic damages, prejudgment and post judgment interest, lost wages, punitive damages, injunctive relief, costs of this suit, including reasonable attorney fees and costs, and such further relief the Court may deem proper.

Dated: March 6. 2020

Guy D. Loranger, Esq., Bar No. 9294
Attorney for Plaintiff

LAW OFFICE OF GUY D. LORANGER  
1 Granny Smith Court, Suite 3  
Old Orchard Beach, Maine 04064  
(207) 937-3257